David A. YOUNG, Sr.

v.

Joshua PARK.

No. 77–363–Appeal.

Supreme Court of Rhode Island.

July 21, 1980.

---

David A. Young, Sr., North Providence, pro se.

Hanson, Curran & Parks, Kirk Hanson, Robert D. Parrillo, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is a Superior Court medical malpractice civil action in which the defendant physician is charged with negligence in the diagnosis and treatment of the plaintiff's ailments. The plaintiff also claims that the defendant never informed him of any of the

risks involved in the treatment prescribed by the defendant. This appeal follows the trial justice's grant of the defendant's motion for a directed verdict on the misdiagnosis and treatment claims and the jury's rejection of the plaintiff's informed-consent claim. Hereinafter we shall refer to the plaintiff and the defendant by their last names.

On September 30, 1962, Dr. Stanley T. Grzebien made a house call at 22 Berwick Avenue in Centredale and there examined a forty-five-year-old male who complained of dizziness and headaches. The examinee was Young. On the next day, October 1, 1962, Young appeared at Dr. Grzebien's office. Young, a toolmaker by trade, attributed his malaise to the odor of paint which permeated his work area in a Cranston machine shop. Doctor Grzebien made a series of clinical tests, which included an analysis of Young's hemoglobin. The results of the hemoglobin test caused Dr. Grzebien to make the following notation in the Remarks portion of the form he was filling out as he examined his patient: "Imp. polycythemia? Primary? * * *."

In speaking to the jury in layman's terms, Dr. Grzebien defined polycythemia as an overproduction of red cells. Thanks to Dr. Grzebien and a number of physicians who followed him as witnesses at the trial, the jury soon became aware that polycythemia is a disease that causes an abnormal elevation in the number of red blood cells, thereby increasing the blood's viscosity and correspondingly multiplying the risk of blood clots. There are two types of polycythemia: primary and secondary. The cause of primary polycythemia is unknown, whereas secondary polycythemia can be attributed to such factors as heart disease, emphysema, or a prolonged residence at high altitudes. Doctor Grzebien also reported that the state of the art was such in 1962 that he was unable to determine whether Young's illness could be classified as primary or secondary polycythemia. Since laboratory tests of Young's blood confirmed Dr. Grzebien's initial impression, Young was referred by Dr. Grzebien, a general practitioner, to Dr. William J. Fischer, a hematologist.

Doctor Fischer first saw Young in October 1962 and prescribed a course of therapy which called for periodic phlebotomies. A phlebotomy, Dr. Fischer explained, "is simply withdrawing blood," and he reminded the jurors that a phlebotomy is performed any time an individual donates blood. The withdrawal lowers the number of blood cells. The doctor's office records indicate that Young at one point thought the phlebotomy therapy was affording him relief. Doctor Fischer was convinced that Young had polycythemia, but he could not specifically characterize it as being secondary to any other disease. Doctor Fischer's file on Young was closed on February 1, 1965, when his office received a call from Young's wife with the information that her husband was then under the care of Park.

Before we consider Park's testimony, we note that five other doctors testified at trial. These five, plus Drs. Grzebien and Fischer, all appeared in response to subpoenas issued by Young.

Doctor George V. Coleman, a surgeon who specialized in tumor surgery, examined Young in April 1964 as the result of a referral by a dentist. Young at that time had a tumor on his upper right gum. Laboratory tests performed at St. Joseph's Hospital confirmed the presence of polycythemia. The surgeon said he had no reason to be "uncomfortable or critical of Dr. Park's management of Mr. Young."

Doctor John C. Osenkowski, a board-certified internist who acted as a consultant to Park, saw Young during the summer of 1965 and subsequently treated him at Our Lady of Fatima Hospital. Doctor Osenkowski gave an affirmative reply when asked if Park's treatment of Young during this period was "sound practice" and "consistent with good medical care."

Doctor Ezra A. Sharp, who also acted as a consultant to Park, examined Young at Roger Williams Hospital in July 1965. He saw Young again in the fall of that year when he was a patient at Miriam Hospital. Young during this time was being treated

for anemia. In cross-examination Dr. Sharp said that Dr. Grzebien's records presented "a clear-cut picture of polycythemia * * * and probably polycythemia vera."[1] Doctor Sharp also revealed that the ailments about which Young was complaining in the fall of 1965 were unrelated to the treatment given by Park.

Doctor Marvin S. Kerzner, a certified internist, observed Young in June 1967. At that time Young had a "severe limitation of motion of his right hand" and a "mild weakness to the left leg." During this period Young was attempting to obtain workers' compensation[2] and seeking to show that his disability was due to conditions in the machine shop, specifically "poisonous" fumes from the carbon tetrachloride used to clean the shop's machinery. Doctor Kerzner made it clear that he was unable to say with any degree of medical certainty what was the cause of Young's complaints.

Doctor Mario G. Baldini, a professor of medical science at Brown University and chief of hematology at Pawtucket Memorial Hospital, examined Young in October 1967. In direct examination Dr. Baldini testified that he could find no evidence of polycythemia. The internist made it clear, however, that this conclusion was limited to the time of the 1967 examination and based upon the information then in his possession. When in cross-examination the witness was shown the results of the laboratory tests taken in 1962 while Young was under the care of Drs. Grzebien and Fischer, he told the jury that this information certainly indicated the presence of polycythemia. Obviously, Dr. Baldini[3] was totally unaware of this information when he examined Young.

Young, in a conversation with his employers, made it clear that he was dissatisfied with Dr. Fischer because he was "not paying any attention to me whatsoever * * ." The shop's employment manager suggested that Young seek the "new shop doctor," who was Park. Apparently, Young was still convinced that he had been poisoned by the carbon tetrachloride fumes. Young first saw Park[4] either in December 1964 or early January 1965. Young concedes that immediately after his first visit with Park, his blood was tested and the results forwarded to Park.

After a physical examination, a study of Young's past history, and a consideration of the results of the laboratory test ordered after Young's initial visit, Park concluded that his patient was suffering from primary polycythemia. Accordingly, the doctor prescribed a course of treatment which called

1. The terms "polycythemia vera" and "polycythemia primary" are synonymous.

2. When Young was examined by Dr. Kerzner, he was attempting to collect evidence that would support his claim that his illness was work related. In a prologue to this opinion found in *Young v. Park*, 116 R.I. 568, 359 A.2d 697 (1976), we considered an appeal by Young from a Superior Court judgment granting the motion of five named defendants to dismiss a complaint in which Young sought to include these defendants in his suit against Park. In a document entitled "Fourth Amended Complaint," Young claimed that Park, Drs. Grzebien, Fischer, and Osenkowski, his employer, and a medical laboratory were all part of a conspiracy to misdiagnose his illness deliberately in order to protect the employer. He had alleged in the amended complaint that all the named defendants were concealing the fact that his illness was a product of the various chemicals used at work. Young settled his compensation claim for $8,000. We affirmed the dismissal of the amended complaint as it related to Drs. Grzebien, Fischer, and Osen-

kowski, the employer, and the laboratory because the attempt to join this quintet came long after the statute of limitations had expired and the record indicated that Young was well aware of the supposed conspiracy as early as January 1, 1966.

3. Young consulted Dr. Baldini in a further attempt to gain support for his carbon-tetrachloride-poisoning theory. When Dr. Baldini was asked who supplied him with Young's medical records, he replied, "I really cannot remember after ten years who gave me those records, and I have no note here. You know, we practice medicine, not law in our office."

4. Dr. Park, a native of South Korea, practiced medicine in that country prior to coming to the United States in the mid-1950's. He interned in New York and in 1961 was licensed to practice in Rhode Island. Dr. Park also pursued his interest in hematology through postgraduate courses taken at Tufts University School of Medicine.

for the daily consumption of a drug called Myleran. During direct examination, Park edified the jury when he pointed out that bone marrow is an essential part of the process that manufactures red blood cells and that Myleran "suppresses the activity" of the bone marrow, thereby reducing the blood-cell production.

■ In assessing the trial justice's grant of a directed verdict, we have the same duty as the trial justice to view the evidence and the inferences to which it is reasonably susceptible in the light most favorable to Young. We do this without weighing the evidence or assessing the credibility of witnesses. Instead, we decide whether the evidence is sufficient in law to support a verdict for the plaintiff. *DiIorio v. Abington Mutual Fire Insurance Co.*, R.I., 402 A.2d 745, 747 (1979).

■ A physician is not a guarantor of either a correct diagnosis or a successful course of treatment. While there is no duty to cure, a physician is bound to exercise the same degree of diligence and skill as physicians in good standing engaged in the same type of practice in similar localities in like cases. We have repeatedly said that, as a general rule, a departure from this standard of care, whether it be at the diagnostic or treatment stage, must be established by expert testimony, except if the lack of care is so obvious as to be within the laymen's common knowledge. *See Schenck v. Roger Williams Hospital*, R.I., 382 A.2d 514 (1977); *Marshall v. Tomaselli & Bellavance*, 118 R.I. 190, 372 A.2d 1280 (1977); *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972).

■ We have no hesitation in ruling that matters concerning polycythemia and Myleran therapy are not so obvious that the need for expert testimony is obviated. Consequently, we search the record for any expert testimony that would generate a reasonable inference that Park, during the eight-month period he treated Young, departed from the acceptable community standards of care practiced by other physicians when confronted by a patient like Young. Our search and scrutiny simply reveals no such evidence, and we must, therefore, affirm the grant of the directed verdict.

Before proceeding to Young's other claims of error, we would briefly address the issue of informed consent. Young was hospitalized during the summer of 1965 because he was suffering from anemia. Park testified that he had told Young that his use of Myleran carried with it the risk of anemia. Young denied that Park had informed him of any of the risks involved in the Myleran therapy. The jury accepted Park's version of what had occurred. The trial justice, in denying the motion for new trial, affirmed this finding.

In seeking a new trial, Young applies a broad brush by claiming that he was denied a "full, fair, and impartial trial." In making this claim, he first faults the trial justice for failing to require his trial attorney to hand over evidence in the case. His second contention of unfairness relates to the trial justice's refusal to admit into evidence an article by a Dr. W. F. von Oettingen. Young next complains about the trial justice's denial of his request that manufacturer's explanatory publication about Myleran be made an exhibit. He is also critical of the trial justice's termination of his examination of Dr. Baldini and the deletion from Dr. Coleman's medical report of two letters, one sent by Young's trial attorney to Dr. Coleman and the other a reply to the first letter. Another claim of unfairness relates to the trial justice's denial of Young's request that Dr. Sharp be recalled to the witness stand. Finally, he objects to a portion of the trial justice's charge and the denial of the motion for new trial.

In assessing these claims, we must look at what confronted the trial justice. When this case came on for trial, it had been pending in the Superior Court for ten years. On the morning of the sixth day of trial, Young discharged his trial counsel even though the trial justice advised otherwise. The discharge came at about 11 a. m., and the trial justice then recessed the trial until 1:30 p. m. because Young assured him that

he would be ready to proceed at that hour. There is no indication in the record that Young ever requested his former counsel to deliver the evidence to him, nor is there any indication at this point regarding what specific evidence he had in mind.

The content of Dr. von Oettingen's article remains a mystery. There was no showing that the article was either relevant or material to the issues then before the court. Furthermore, there was no compliance with the thirty-day pretrial notice required by G.L.1956 (1969 Reenactment) § 9–19–30 (1979 Supp.), a statute that in medical malpractice actions permits the introduction into evidence of relevant statements of facts or opinions contained in a published treatise, periodical, book, or pamphlet. The same thirty-day-notice requirement also applies to the manufacturer's publication.

Doctor Baldini was the chief hematologist at Pawtucket Memorial Hospital when Young sought his services in October 1967, more than two years after Park had terminated his treatment of Young. As noted earlier, when Dr. Baldini examined Young, the patient was attempting to establish his claim that he had been poisoned by the carbon tetrachloride fumes at his employer's machine shop. On the last day of trial, Wednesday, June 1, 1977, Dr. Baldini appeared voluntarily, at the request of the trial justice, to testify. The doctor had come to the courthouse on the previous Friday in response to Young's subpoena, but the trial had been recessed, and apparently nobody had informed Dr. Baldini of the recess.

Young began his redirect examination by asking the witness what conclusion he reached when he was informed of the results of the laboratory tests of his blood in 1962. The internist replied: "Erythrocytosis." (Erythrocytosis is another name for polycythemia.) The interrogator then asked: "How about hemolysis?" (Hemolysis is the destruction of red blood cells.) Doctor Baldini told the trial justice and the jury that hemolysis was a completely different disease having "nothing to do with our discussion." Young continued on the hemo-

lysis track until the trial justice directed him to pursue another line of inquiry. Doctor Baldini was then asked to define the term "leukocytosis." "Leukocytosis," he said, is an abnormal increase "of the white cell count in the peripheral blood." When asked, "And what causes that, doctor, as a rule?" the reply was the same as it was when the question was asked in direct examination that "one hundred twenty causes are responsible." Young proceeded to ask the witness in successive order if leukocytosis was caused by "chemical poisoning," "appendicitis," or "gasoline, kerosene." When Dr. Baldini gave negative responses to this line of inquiry, Young asked the witness if he was "[s]tanding behind your statement that chemical poisoning doesn't cause leukocytosis."

At this point, the interrogation became a confrontation and a near argument as Young continued to refer to the chemical poisoning. The witness began to complain about the discussion's going far afield and his inability to frame a proper response to the questions being propounded by Young. Objections were sustained to various questions. After Park's objection to a question asking Dr. Baldini if he knew "what poisoning would show in the blood," Young reported, "I'm confused, Your Honor." The trial justice ended the confusion by excusing the witness.

The trial justice deleted the correspondence between Young's trial counsel and Dr. Coleman on the basis that the communications were not part of the surgeon's report of Young's treatment. The attorney's letter inquired about the surgeon's willingness to testify as an expert witness in Young's behalf. The reply informed Young that the issue to be resolved at trial was not within the surgeon's expertise. Excusing Dr. Baldini as a witness and excluding the correspondence are matters within the trial justice's discretion, and we see no abuse of that discretion.

When Young complained about his inability to examine Dr. Sharp, the physician had already testified. He had been examined by Young's counsel. The issue of Dr.

Sharp's return to the witness stand arose when Young presented to the trial justice "documents" that were obviously part of his former attorney's records, that is, the attorney who first represented Young when he initiated this litigation in April 1967. The file contains notes prepared by the attorney, correspondence to and from Young, and miscellaneous documents. The file was not introduced into evidence at the trial, but it was made an exhibit for the purposes of identification when the deposition of Young's first attorney was taken in July 1973. Doctor Sharp's deposition was taken on August 22, 1973. The document in question is a notation that indicates Dr. Sharp's willingness to testify in Young's behalf.

Confronted with this document during the taking of his deposition, Dr. Sharp was asked if he had expressed such sentiments. He replied:

> "No. That is part of the patient's confabulation. His method of citing and talking and asking questions and assumes that he knows the answers without you giving him an answer and he'd ask all sorts of questions, and whether you say yes, no or nothing, he makes his own answers. I have nothing to do with that."

Clearly at the time Dr. Sharp testified, the opportunity was available for Young to inquire about any conversations the witness had with the attorney who first investigated Young's claim. Not one question was directed to this matter. When Young took over as trial attorney, he was not entitled to a second bite.

 We find ample justification for the denial of the new-trial motion. When faced with conflicting testimony, the jury believed Park. The trial justice affirmed this belief, and there is nothing in the record which would justify disturbing the action taken by the trial justice. It is black-letter law in this jurisdiction that a charge to which no objection is lodged becomes the law of the case. Thus, Young's failure to object to the trial justice's instructions bars any consideration of this facet of the case.

 Finally, Young claims that the Superior Court erred in its denial of his pretrial motion filed under the provisions of G.L. 1956 (1969 Reenactment) § 9–17–19, which authorizes the appointment of an impartial expert. This power, we have said, is purely discretionary. *Raymond v. Raymond*, 105 R.I. 380, 387, 252 A.2d 345, 349 (1969); *DeCourcy v. American Emery Wheel Works*, 89 R.I. 450, 454, 153 A.2d 130, 133 (1959). In denying the motion, the trial justice pointed out that Young had failed to make a showing that he was unable to secure expert testimony. Attached to Young's motion were both the letters from his trial counsel to various physicians soliciting their assistance and their replies. One of the physicians declined to testify after reviewing the matter because of some "incredibly bizarre aspects of your suit." There was no evidence that the other two physicians absolutely refused to testify. We perceive no abuse of discretion in the denial of this motion.

The plaintiff's appeal is denied and dismissed, and the judgment appealed from is affirmed.

BEVILACQUA, C. J., and MURRAY, J., did not participate.